

## Office of the Attorney General
### State of Texas

**DAN MORALES**
ATTORNEY GENERAL

May 13, 1996

The Honorable David Sibley
Chair
Economic Development Committee
Texas State Senate
P.O. Box 12068
Austin, Texas 78711

Opinion No. DM-391

Re: Validity of an agreement between a municipality and a telecommunications services provider that in effect creates a joint venture between those two entities (RQ-886)

Dear Senator Sibley:

You have requested our opinion regarding the validity of an agreement between a municipality and a telecommunications services provider that in effect creates a joint venture between those two entities. You indicate that, on November 27, 1995, the City of San Antonio, acting through its wholly owned electric utility, the City Public Service Board ("the city"), entered into a twenty-five year contract with ICG Access Services, Inc. ("ICG"), a provider of telecommunications services. The agreement provides, among other things:

1. The city and ICG will jointly construct and operate a telecommunications network, part of which will be used by the city for its internal requirements, and the balance of which will be used for the provision of telecommunications services to the public. The city and ICG will each pay 50% of the cost of construction;

2. The city will install the fiber optics and ICG will install the electronics necessary for the provision of telecommunications service. The network will be jointly operated by the city and ICG. The city will be responsible for the maintenance and repair of the fiber optics and ICG will responsible for the maintenance and repair of the equipment;

3. The network will be largely located on city right-of-way. ICG will have access to secured city buildings and facilities, and may collocate its equipment at city substation sites;

4. ICG will act as the city's marketing representative with regard to any excess fiber capacity;

5. ICG will not use the network to compete with the city, and the city will provide a list of potential business opportunities to ICG annually;

6. The city and ICG will jointly share the costs of construction, divide the revenues received from the provision of telecommunications service, and share any revenues received from the lease of additional excess capacity to any third parties;

7. After the third year the agreement is in effect, ICG and the city will divide revenues from the portion of the network dedicated to the provision of telecommunications services to the public, specifically, to ICG's customers and "sublicensees," except special access services. Through such revenue-sharing provisions, the city shares in the success of the venture in proportion to the revenues produced through sales by ICG to the public of telecommunications services provided over the network jointly paid for by the city and ICG;

8. If the city provides excess fiber capacity to third parties presented by ICG in its capacity as the city's marketing representative, ICG will receive a "marketing fee" equal to one-third of the gross revenues received by the city from any such arrangement. Furthermore, ICG will receive the *same* marketing fee for any fiber provided by the city to third parties through its own efforts and *without* activity by ICG;

9. The city and ICG will share legal expenses to defend against anticipated opposition to the agreement;

10. The agreement confers on ICG the right to use the city's rights-of-way for the provision of telecommunications services without the need of entering into a franchise agreement. In lieu of payment of franchise fees, ICG agrees to pay the city 5% of its gross revenues derived from telecommunications services "fully provided" over the network. ICG also agrees to provide the city with up to 1000 access lines free of charge and, in addition, telecommunications services at cost;

11. The agreement recognizes that, "but for the unique nature of the project contemplated by the agreement, ICG would be installing its own facilities and entering into a separate franchise agreement with the city";

12. ICG has the right under the agreement to use designated portions of "primary" and "secondary" extensions to the network in return for payment of its share of the construction costs of such extensions and modifications, based on the share of usage by ICG.

The 1995 regular session of the legislature amended section 3.251 of the Public Utility Regulatory Act of 1995,[1] V.T.C.S. art. 1446c-0, by adding subsections (c) and (d):

(c) A person may not provide local exchange telephone service, basic local telecommunications service, or switched access service without a certificate of convenience and necessity, a certificate of operating authority, or a service provider certificate of operating authority.

(d) A municipality may not receive a certificate of convenience and necessity, certificate of operating authority, or service provider certificate of operating authority under this Act. In addition, *a municipality or municipal electric system may not offer for sale to the public, either directly or indirectly through a telecommunications provider, a service for which a certificate is required or any non-switched telecommunications service to be used to provide connections between customers' premises within the exchange or between a customer's premises and a long distance provider serving the exchange.*[2]

In our opinion, if the agreement contains the provisions which you have set forth in your letter, it constitutes a degree of participation by the city in the provision of telecommunications services, and thus involves a "sale to the public . . . indirectly through a telecommunications provider, a service for which a certificate is required."[3] Specifically, the following provisions of the agreement, taken together, bring it within the prohibition of subsection (d) of section 3.251: the sharing of the costs of construction; the joint operation of the network; the sharing of revenues derived from the provision of services and the lease of excess capacity to third parties; the award of a "marketing fee" to ICG from gross revenues received by the city regardless of ICG's degree of participation in the

---

[1] S.B. 319, Act of Mar. 23, 1995, 74th Leg., R.S., ch. 9, § 1, 1995 Tex. Sess. Law Serv. 31, 75.

[2] H.B. 2128, Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 23, 1995 Tex. Sess. Law Serv. 2017, 2032 (footnote and emphasis added).

[3] V.T.C.S. art. 1446c-0, § 3.251(d).

marketing of services; the sharing of the costs of legal expenses necessary to defend the agreement; and ICG's payment of five percent of its gross revenues to the city in lieu of franchise fees.

Furthermore, when introducing the amendment to section 3.251(d) on the floor of the senate, you explained that the amendment would prohibit a city from entering the telecommunications business:

> Members, right now, cities are in the business of regulating these utilities. They own the rights-of-way. Franchise fees are paid to them. We don't think it . . . fair for them to be able to also enter into the business.[4]

We thus believe the legislature intended to permit a municipality only to grant franchises to utilities that desire to provide telecommunications services and to provide rights of way to those utilities, and we construe section 3.251(d) accordingly. We do not believe that the legislature, in enacting section 3.251, intended to countenance a city's participation to the extent that you have described here. Thus, in this situation, because the City of San Antonio proposes to permit ICG to bypass the normal franchise procedure and to provide ICG with something more than a right of way -- *i.e.*, the dark fiber itself -- we must conclude that the proposed contract contravenes section 3.251(d).

## S U M M A R Y

> Under the facts described, an agreement between the city of San Antonio and ICG Access Services, Inc., constitutes a degree of participation by the city in the offering of telecommunications services to the public that is prohibited by section 3.251 of the Public Utility Regulatory Act of 1995, V.T.C.S. article 1446c-0.

Yours very truly,

DAN MORALES
Attorney General of Texas

---

[4]Debate on H.B. 2128 on the Floor of the Senate, 74th Leg., R.S. (May 12, 1995) (statement of Senator Sibley) (transcript available from Senate Staff Services).

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Rick Gilpin
Assistant Attorney General